Good morning, Your Honors. Dan Ferry on behalf of the appellant to Cascades Computer Innovation. I'd like to reserve three minutes for rebuttal. Thank you. May it please the Court. There are two issues. The first is whether the jury verdict of non-infringement of the 750 patent served to divest Cascades of antitrust standing. The second is whether that verdict of non-infringement, which occurred more than three years after the alleged antitrust violation, rendered that violation implausible. Turning to the first issue, antitrust standing, or more specifically the requirement to plead antitrust injury, the District Court's opinion does not set forth its reasoning as to how the 2015 verdict could affect an injury that occurred in 2012. The District Court says that it accepted the logic of the District Court of Connecticut in the Soundview case, but the sparse logic in Soundview is flawed. The conclusory statement that non-infringement fully accounts for a patentee's inability to license its patent is unsupported in Soundview and cannot apply here to Cascades. First, the 2015 finding of non-infringement cannot fully account for the injury that Cascades suffered in 2012 because that finding came more than three years after the injury. The cause cannot come after the effect. Well, that's only if we think that the jury was doing something other than telling us something that was true all along, right? If the finding in the Chicago court was there never was a license that was needed here, there never was infringement, and we think that's true, then that was true in the earlier time as well, three years earlier. All the jury's finding can lead to, all the jury's finding can mean is it can lead to an inference that the manufacturers in 2012 also thought that there was no infringement. So that begs the question of whether there was a conspiracy in 2012 or whether there was independent conduct based on independent conclusions of non-infringement. What was the injury to competition as a result of the alleged conduct? The conduct was in itself an injury to competition. It was... What competition? I'm having real trouble understanding, and part of the problem is we're in the, we've gone through the mirror into Wonderland because we're dealing with a patent here. So we have a legal monopolist on one side of the equation, and I'm having trouble understanding what the competition would be and especially what injury would be suffered by a consumer out of any of this. The injury to competition is from the manufacturers who are on the purchaser's side of the market agreeing that they would not independently deal with Cascades. So instead of competing for a license to the patent, for instance... But it wasn't an exclusive license, so they never really were competing with each other, were they? But it could have been an exclusive license. The agreement itself is, it prevented any competition. If the manufacturers... In the end, there was, I mean, I'm kind of lost as well because what, I mean, no deal was done. There was apparently at one point an offer that was withdrawn because somebody decided not to pay the price, and so that's kind of the antithesis of an agreement because they didn't have an agreement. Some party didn't agree, and so there wasn't an offer made to your client on a collective basis, and there apparently weren't offers made to your client on an individual basis. You have a bunch of people that decided that they weren't going to pay for this patent, and how is that an antitrust violation? Let me step back, Your Honor. There was an offer on a collective basis, and that offer was through RPX. I'm sorry, that offer was what? Was through RPX, the appellee. RPX is a patent aggregator. What it says is that it offers, relevant to this case, certain of its members, if they all have an interest in a patent, it says we'll get you wholesale pricing. If you negotiate through us alone, if we serve as your agent, then you'll have to pay less. But the offer went through RPX, but you made a big point in your briefs that, in fact, none of the potential buyers actually responded. So the offer was, even through RPX, at least it was an invitation that all of these buyers should come forward and deal with you directly. And your argument about competition is, well, that competition was prevented because they all gathered together and refused to talk individually as well as as a unit under RPX. Isn't that what your point was? I may have misunderstood your question. Our point, if this answers, is that the manufacturers decided, if we're going to negotiate for license to this patent, we're going to do it through RPX as a collective, but we're not going to individually negotiate for license to this patent. And RPX then came forward with an offer, a high seven-figure offer, which shows that somebody wanted a license to this patent. But then it withdrew the offer because at least one member refused to pony up for the collective sum. Does that answer your question? Well, yeah. But then the next step was you then criticized all of the companies, Samsung, et cetera, all of them, because they didn't respond individually. Because even though the offer was made by RPX, withdrawn by RPX, you made other overtures to the other side to try to get negotiations going. Did you not? And that is where the conspiracy comes in. Right. That's what you say is the conspiracy which impacts competition. And most notably, Motorola saying, we don't want to – we're not going to negotiate with you individually. We want to deal with this through RPX. So it affects competition maybe, or it affects the ability of your client to get money for this patent. But I would have thought your answer about where the harm to competition was, was that somehow this undermines the rewards for invention that the patent laws protect and that that's the harm to consumers. I mean, there's no harm to consumers of how much Samsung pays for this. Whether Samsung negotiates together or not, it all comes back to whether the inventor is rewarded, right? I do agree with that. I would just say that the harm to competition is in them not agreeing to compete. The harm to consumers is in the reduction in incentive to innovate. But I think one thing needs to be clear is that – The harm to competition comes from the patent laws. And if ultimately it's concluded there's no infringement, I'm not sure antitrust law is intended to give you a broader patent than the patent law gives you. The fact there was no infringement – sorry, let me step back. I mean, I don't think that's a successful answer to the question of what's the harm to competition. The harm to competition – I'm struggling to find what harm there was to competition here. I don't see any. Participants in a market, the manufacturers, agreed that they would not individually compete for a license to this patent. But they didn't agree – I mean, they just didn't do business with your client. Is this a refusal-to-deal case? That begs the question, Your Honor. We are saying that they did agree. Their refusal to deal individually with our client was because of the agreement not to compete. Now, if they had made only a collective offer and your client said I'm not going to deal with you collectively, maybe somehow we're in the world of competition. But that's not what happened. There wasn't an effective offer made collectively. There weren't individual deals negotiated. There just wasn't anything here. And out of that, you're trying to construct an antitrust injury, and I'm still waiting to hear what the harm to competition is. Again, Your Honor, there was a collective offer made through RPX. But withdrawn, because you just acknowledged one of the parties behind that collective offer decided not to pony up, and the rest of them didn't reform the offer without that party. That just nothing happened in the end. Again, that – there are facts here which show a conspiracy. And this goes to the issue of plausibility. But there's no fact showing an injury as a result of that, let alone an antitrust injury. The injury was the inability to license the patents. And that injury resulted from the conspiracy not to deal with Cascades, which is an antitrust injury flowing from a reduction in competition, which is the essence of antitrust injury. To go to the – to turn to the issue of plausibility, there was the parallel conduct, where Samsung, HTC, and Motorola all refused to independently deal with Cascades. But there are also facts here showing that there was a conspiracy. There was RPX's high seven-figure offer showing that somebody wanted a license to this patent. Was there anything that prevented the members of that group, other than the one who refused to pony up, from reformulating and making a different offer? The conspiracy, Your Honor. No. That's not an answer to the question, because that means if there are six people on the market and five agree to do it together, they could do a deal if they thought they needed to do a deal. The more plausible explanation, and this is where I will raise a Twombly, is that they looked at this and said, well, we don't really think we need this patent, but we don't want to be exposed if we don't have to. I don't want to take on a cost that my competitors aren't taking on. So if everybody pays something to get rid of this guy, okay. But if other people aren't going to pay, I'm not going to raise my costs and put myself vis-a-vis the competitors in a disadvantageous position. So that's why it makes sense for me to get aboard that train only if everybody else is aboard that train. That's an individual decision. That may be. If that's what happened, Your Honor, that may be an individual decision that's not an interest violation. But that's what will explain why the five who were apparently in agreement to pay and the six who wasn't wouldn't come back and say let's do a deal with five. What do you have to offer that's at least as plausible? I don't disagree that there is a plausible explanation for how this was individual conduct. But there is also a plausible explanation for a conspiracy. There is more than the mere parallel conduct here. There's more than the mere parallel conduct. How do you explain why the remaining five didn't get together and proceed through RPX? Because they agreed that they would only negotiate together. Why do they care about number six being outside the circle unless they don't think they really need this patent and don't want to bear a cost? At this stage, I don't know that we need to answer that question, Your Honor. But to answer your question. I'm having trouble finding another plausible explanation for this other than a set of individual decisions. Motorola's statement, I think, undermines your contention that it would not negotiate individually. It fits perfectly. I don't want to bear a cost unless all my other competitors are going to bear a cost because if I pay it and X does not, X has a competitive advantage over me in the marketplace because it's not paying this unnecessary cost. That may be the case. But it also may be the case, Your Honor, that there was an agreement that we were all going to take a license or none of us would. And if that was the agreement, if these were not individual decisions, then there's an antitrust violation. I'm completely lost as to how an individual firm could make that decision. If they thought they needed the patent, then there's no reason for them not to either negotiate individually or collectively with leaving the guy out who refuses to play ball. But they don't. Certainly there is, Your Honor. The fact that the fact there was a valid patent, first of all. And there's nothing that shows that they thought they did not need a license. There is the nondisclosure verdict. What shows that they did? They're willing to pay some insurance against the risk, but the fact that none of them were willing to pay individually and that the other five wouldn't pay anything without the six suggests to me they weren't in great fear of this patent. The what shows that they did was the RPX's offer, which shows that somebody thought that there was a need for a license, and that was completely withdrawn. Well, not necessarily a need, but a benefit in obtaining a license. I buy insurance in my house. I don't expect there to be a fire, but I buy it anyway because it's worth it for the insurance policy. It makes perfect sense for them to decide to pay something to Cascade because there's sufficient risk here. But do they feel so much at risk that they're willing to strike a deal individually? Apparently not. And it turns out they were right. It turns out that they were right. But that's not the question. The question is what was there? I have a broader question, but a little bit, well, related. Essentially, is this the kind of situation in which there really is there should be an antitrust injury here? This is a situation ultimately when there's a determination that there is no requirement that you get a license. From the broader perspective of antitrust law, is this the kind of injury that is supposed to be covered? Sure. Maybe they were noncompetitive earlier on, but some of them may have been thinking, I don't know, why we have to even negotiate? We don't have the requirement to get a license, and they were in fact confirmed. So why is this really covered by antitrust litigation or antitrust law? The facts alleged would show a conspiracy that could be analyzed under a per se analysis under section 1 of the Sherman Act. The district court in denying the appellee's motion to dismiss said, but this involves a patent. It's a little unusual. I'll look at it under a rule of reason. And that may have been the correct analysis, because a refusal to license a patent may have procompetitive justifications. That is an issue that could be dealt with in a rule of reason analysis, but that's  Are there any cases challenging RPX's conduct in a situation where the patent was infringed? I mean, this doesn't seem like your best test case for this antitrust theory. It may not be, but no, there are no cases I know of. And so no one has evaluated this kind of monopsony purchasing of a license kind of theory of antitrust? There are the cases cited. There's the Soundview case, which held that a noninfringed patent could not give rise. The Third Circuit in Jones-Knitting did recognize that a group boycott to not license a patent could give rise to an antitrust violation. And I believe that the appellee cited the circuit or, excuse me, the district court Jones-Knitting opinion, but I can give you the Third Circuit opinion as well. I'm sure we can find it. Okay. Thank you. We'll give you a minute for rebuttal. We took you through the time you wanted, but I'll still give you a minute. Thank you. Good morning, Your Honors. May it please the Court. My name is Mike Scarborough. I represent Samsung Electronics, and I'll be arguing on behalf of both of the defendant appellees today. I'd like to start just by noting a couple of things that we didn't hear any argument about, and it's our position we didn't really see any meaningful briefing about, but I think are important building blocks that allow the district court to get where it did ultimately. One is we didn't hear any argument from Mr. Ferry that the non-infringement verdict as to Samsung didn't apply with equal force to all three of the manufacturing defendants. So we don't think there's any real contest there, but that is an important building block we need to have a complete dismissal of the case. He said impliedly in his brief, which, I mean, he basically acknowledged it would apply to Samsung and suggested that he had a dispute as to whether it applied to others, did he not, in the brief? He did. In the opening brief, there was one sentence that said it was a, I believe, an improper quantum leap to take the Samsung non-infringement verdict and apply it. It's the quantum leap statement, I read. Yes. It is a memorable one. But we presented a fairly overwhelming record in the court below and again through to this court that it really does apply and that the theories of infringement as between Samsung and HTC and Motorola, it's all the same infringement theory. And that came through submissions directly from Cascades admitting that they had the same infringement theory. It came from rulings from the court. You've got to remember that the district court in Illinois hearing all the patent actions, Samsung and Motorola were sued together. There was consolidated proceedings, a consolidated claim construction order. There was a patent exhaustion order between Samsung and HTC. There is no serious dispute that the non-infringement verdict should not be applied to all three manufacturing defendants. So I think that's important to note. Another thing that we heard a lot about at the hearing on the underlying motion for judgment on the pleadings, a lot less so in the briefing, was the idea that there's more to this case than just the 750 patent, that even though that that's the one that's mentioned 73 times in the complaint and that Android is what talked about, that there's this portfolio of other patents that have value and that matter. And I didn't hear anything about that today. And I don't think I'm not sure that you didn't hear something today is very meaningful, because Mr. Ferry didn't have a whole lot of freedoms to talk about whatever he wanted to talk about. I mean, he kind of directed the conversation. So if he argued it in the brief, it's not been waived. And the fact that he never got to it today is just kind of what happened. Fair enough, Your Honor. Well, then, to that point, I would say I think the evidence is fairly overwhelming that this case is entirely about the 750 patent. Well, you've got the 130 patent, which is at issue with Samsung, but then you've only got 70 percent market power on that particular claim, so that becomes less significant. Correct. Correct, Your Honor. The 130 patent, it's clear that it's only Samsung that would need the DRAM patent. So your fundamental allegations of conspiracy, you know, why would Samsung agree to collude with anyone else? Nobody else needs this patent. Their motivations to enter into any kind of conspiracy just don't make sense. And you're only 17 percent of the market, as I recall, at least from your briefing. Actually, I think that 17 percent of the market theory is with respect to the Android figure. But you may be correct, Your Honor, that in any case, there are no comprehensive market power allegations with respect to DRAM, and in any event, it would only apply with respect to Samsung. But I want to turn now to the thrust of counsel's argument today, which was having to do with antitrust injury and having to do with the plausibility analysis. I would agree on one level with him that you could argue that there is, at least on the pleadings, an antitrust violation alleged here, at least initially. But you can have an antitrust violation and you can have injury in fact, but you can still not have a case because you don't have the type of injury that the antitrust laws care about. And for purposes of your analysis of antitrust injury with respect to the 750 patent, I would submit that that's exactly what the Court has to consider here. We cited three different cases. Granted, none of them are from this Court or the Supreme Court that looked at this situation. The Soundview case, which dealt with a non-infringed patent, the Jones Knitting case, and the Hayes Microcomputer case, which was an unpublished decision from Judge Conte here in San Francisco. And they all say in this type of scenario that there's no antitrust injury. This is not the type of scenario that the antitrust laws were intended to address. They do it through different angles. The Soundview case says, gee, this is kind of a proximate cause element of antitrust injury. Jones Knitting says this is really an unjust enrichment principle. And the Hayes Microcomputer case says this is just pure, purely this is not the type of injury that we think the antitrust laws should get to. The RPX business model, let's leave aside the facts of this case, or change the facts so RPX makes an offer, it's not an offer that's withdrawn, it actually makes an offer and says, and RPX's own materials seem to say to its members, you can save money by dealing through us because we do it collectively, we'll get it to you wholesale. So there's at least some evidence to suggest the business model is intended to make it hard for, in this case, Cascade, but whoever has the rights to a patent, to go negotiate individually. RPX says, we can get it for you cheaper, so come with us and do it collectively. Well, as soon as you start talking about do it collectively and don't do it individually, doesn't that suggest what antitrust law tries to prohibit? Well, I think the difference here is that you don't have the second part of your scenario. There is not a suggestion by RPX to don't do it individually. Well, but there is enough, there is evidence in the record that Motorola, I think it was, said we're only going to do it together, not separately. So it can't be the case that RPX says to its people, go ahead and do it independently if you want to, but do it collectively, too, and those are alternatives. There's at least some suggestion that it's collective or nothing. And so from an evidentiary point of view, that might be enough to create a question of fact as to whether there, in fact, was an agreement not to deal independently. And, Your Honor, I think that's exactly probably the analysis that the district court did. We had two motions to dismiss. The first one was granted for failure to allege specific allegations of conspiracy, failure to define a coherent market. And then the second time around, the court said, in large part, what you did, which is I think there may be enough here. I have a statement of someone from Motorola such that balancing the plausibilities of the two different possibilities here, there's enough to get past the motion to dismiss stage and to move forward. But at best, all that says is maybe you have, at least theoretically, an antitrust violation. Of course, we deny that and would have disputed that at trial and at summary judgment, but that doesn't matter for purposes of antitrust injury. You can assume that there is an antitrust violation. You can assume that this plaintiff was actually harmed, that there is injury, in fact, caused by that antitrust violation, but it can still be something that the antitrust laws were not designed to redress. And that's exactly the situation we have here. The antitrust laws were not designed to enrich a plaintiff who's suing on a patent that we know now for sure is non-infringed. So this idea that we know for sure, does that deny that there's uncertainty in patent law and who will win these cases? No, it doesn't, Your Honor. And we wouldn't deny that. Obviously, there are some other defendants that decided to take licenses to avoid precisely those uncertainties. But a patent is a legally created monopoly. So when we have something like we have here, which is an after-the-fact judicial determination that, in fact, this patent is not infringed, and we know also from other judicially noticeable facts that we know it's not infringed as to any of the relevant conspirators, then the patent loses any validity and the antitrust laws can't be used as a vehicle to give windfall profits to a monopolist in space that it doesn't deserve that monopoly. And we know for certain that it doesn't deserve that status. But you don't know that at the time of the alleged conspiracy or the alleged agreement. So why are the parties to an agreement allowed to take advantage of knowledge they don't have at that time to justify the agreement? I mean, if the patent, if it were later determined there was infringement, that might make a case with more curb appeal from the plaintiff's perspective, but it doesn't really change the nature of the agreement between the parties at the time the agreement was made because they don't know one way or the other how that patent would be adjudicated. I mean, let me change the facts entirely. Suppose the competitors, it's not about a patent. It's about these guys are making cell phones. They need a rare earth material that's only available from Botswana, and in Botswana they control the market. And so you've got to deal with that kind of monopolist. And somebody says, well, let's band together so that these guys can't extract too much from us. And so we're going to make an agreement that we're not going to deal with Botswana minerals except all of us collectively, the kind of thing that would sound like an antitrust violation. And then three years later before the case goes to trial, it turns out they figured out a way how to make these phones without that rare earth material. So they never needed the conspiracy in the first place. That wouldn't seem to be a defense that, well, it turns out we didn't need it, so never mind. In this case, they learn three years later the patent is not infringed, but at the time they make the deal, that's not within their knowledge. So they're making their decisions at that point. Why does a conspiracy become lawful? Because of something that happens in the future. Your Honor, I think the fundamental answer to that is that patents are different. Patents are not like widgets or rare earth. So this is all about patents. And the fact that you can have a monopolist in another context, if it's not driven by the patent law, antitrust law could apply. But because patents are involved here, you say that the persons, that you can't have an antitrust violation based on conspiracy of people that need to acquire non-exclusive rights to the patent. You cannot have antitrust injury from a patent holder trying to assert a patent that is not infringed. And that is... But they say that again presumes knowledge at the time of what's going to happen in the future. I'm not sure I understand the basis for that. Well, a couple of different answers to that. One is that antitrust standing, as to which antitrust injury is a core element, something that can be raised at any point of the litigation until it's completely over. And the other thing I would note, for your honor, is that when the district court was entertaining the motions to dismiss, it was entertaining two different plausibility analyses. It had, on the one hand, Cascades saying it's plausible that they all got together through RPX or through some other means and agreed not to negotiate individually with Cascades. So that was one of the explanations. The defendant's explanation was, no, we didn't need this patent, we weren't infringing this patent, and the price that you were asking for it was too high, even considering a nuisance value analysis. And ultimately, the district court said, and this is actually in the first motion to dismiss at 212 of the supplemental record, said, defendants, I'm not going to go that far. Your plausibility analysis has to stand on its own, giving some credence to Cascades theory that there is infringement. We now have a changed universe where the court cannot indulge in crediting that inference. And is the changed universe because of the rules of preclusion, our legal rules  No. No. No. No. No. I mean, is that what causes this? I mean, it seems like you have to have some theory about what the jury decided in the infringement case that sort of changes something from three years earlier that either has to be about we are required to treat it that way because of preclusion or some metaphysical truth that we're required to assume the jury found or something. I'm not sure what your underlying theory is about why this changed something from three years earlier. Yes. It's issue preclusion. It's collateral estoppel. It applies. And there was never any objection. We didn't have to spend a whole lot of time arguing about this in the court below that that verdict in the Samsung infringement case had immediate application as soon as it was entered to be used in this case. And it's relevant because it basically suggests that all during that period of time, the three years, in fact, there was no infringement, which differentiates your situation here that you're arguing from what Judge Clifton has just used as another hypothetical, and that's the situation where all of a sudden another product happens three years down the road, and you didn't know it necessarily was coming. So your basic argument, I think, is essentially going back the three years, clearly there was no infringing, and they would theoretically be aware of that. Well said, Your Honor. I agree completely. Well said? Oh, great. Can I put that on my resume? Oh, no, I'm sorry. So the Federal Circuit in valuing patents has sometimes given a different value before and after an infringement verdict. Doesn't that approach kind of contradict your approach here? It certainly doesn't contradict the case law that we've seen. I mean, granted, there's not a whole lot of case law looking at either infringement or invalidity, but the case law we've seen has said, look, from an antitrust point of view, more or less, this doesn't feel right. This isn't what this is about. You know, antitrust and patent are at loggerheads enough. Certainly what we're not going to do is if someone loses an infringement case, we're not going to allow them to use the antitrust laws as the vehicle to vindicate a patent right, which they've already been shown to not have, that that's just not what antitrust is about. Okay. Thank you, counsel. Thank you. We gave your opponent almost two extra minutes, so I think you should get three minutes for rebuttal. The non-infringement verdict does not matter to antitrust injury. Antitrust injury, the antitrust injury requirement, inquires into the cause of the plaintiff's alleged injury. Here, the cause of Cascade's inability to license its patents in 2012 was a conspiracy in that same timeframe. The non-infringement verdict cannot interfere with that alleged causal relationship and thus cannot affect antitrust injury. Turning to plausibility, Twombly says there can't just be allegations of parallel conduct. But here, there are much more than just allegations of parallel conduct, although there is that. There are other allegations that show an intent to restrain trade through only dealing through RPX and not negotiating individually. And again, those include RPX's statement, and they're also laid out in our brief, but RPX's statement that its clients insisted on a license the entire portfolio as part of negotiations for the 750 patent. That shows discussions and a common agreement as how to deal with Cascades. And again, Motorola's statement that we're not going to deal with you individually. We will only deal with you through RPX. Can we rule for you without saying something that would suggest the jury might have been wrong? Absolutely. The jury can be 100 percent right. But it does not mean that in 2012 that the manufacturers refused to negotiate with Cascades because they thought that the patent was not infringed. Patents are a black box. This was extremely complex technology. It involves an operating system. If the reason that they did not negotiate with Cascades was because they decided we're only going to negotiate through RPX, we win whether there's infringement or not. So you think all that matters is what's in their heads rather than whether they actually had a risk of infringement? I mean, if they're, like, all delusional and think that they need a copyright license for Mickey Mouse, I mean, that can't be a basis for antitrust violation if they don't get one. If they were engaged in a conspiracy with an intent to restrain trade that harmed competition, there's an antitrust violation. I think that the issue that patents raise, and this is an issue for another day, is whether there is a pro-competitive justification for group purchasing agreements with respect to patents. But that does not go to antitrust injury. That goes to the rule of reason analysis under the Sherman Act, Section 1. Thank you, Your Honor. Thank you. The case is submitted, and we're adjourned for the day.
judges: Clifton, Friedland, Sessions